IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| HECTOR MARTINEZ and JOLAYNE HOUTZ, husband and wife, individually and as Co-Personal Representatives of the ESTATE OF SAMUEL H. MARTINEZ, <br><br> Appellants, <br><br> v. <br><br> WASHINGTON STATE UNIVERSITY, a subdivision of the State of Washington, <br><br> Respondent, <br><br> ALPHA TAU OMEGA FRATERNITY, INC., an Indiana Corporation; GAMMA CHI CHAPTER OF ALPHA TAU OMEGA FRATERNITY, an association; RICHMOND PROPERTY GROUP, LTD., an Indiana Corporation; LUKE HAWKSFORD, an individual; ANDREW MISCHKE, an individual; WESLEY OSWALD, an individual; COLE SOREANO, an individual; JORDAN JAMESON, an individual; and JOHN DOES 1-10, individuals, <br><br> Defendants. | No. 83853-9-I <br><br><br><br><br><br><br><br><br><br> PUBLISHED OPINION |

BOWMAN, J. — Samuel "Sam" Martinez died of acute alcohol poisoning in November 2019 following a hazing ritual at a fraternity house located near the Pullman campus of Washington State University (WSU). Sam's[1] estate representatives and parents Hector Martinez and Jolayne Houtz (collectively

---

[1] For clarity, we use Sam's first name and mean no disrespect by doing so.

Estate) appeal summary judgment dismissal of their lawsuit against WSU.  WSU

contends that it owed no duty to protect Sam.  Because WSU has a special

relationship with its recognized fraternal organizations, we conclude that it owed

a duty to use reasonable care to control the fraternity and protect Sam from the

foreseeable harms of fraternal hazing and alcohol misuse.  We reverse and

remand.

## FACTS

Before describing the events leading to Sam's death, we review the

relationship between WSU and its recognized fraternal organizations.

1.  Requirements and Benefits of Recognition

WSU is a public university with its main campus in Pullman.  There are

about 20,000 undergraduate students at WSU.  About a quarter of those

students are members of its roughly 65 recognized fraternities and sororities.

WSU's Center for Fraternity and Sorority Life (CFSL) is the department that

recognizes, "provide[s] advising support for," and recommends sanctions for

fraternal organizations.

Before WSU will officially recognize a fraternity, the fraternity must enter

into a "Relationship Agreement for Residential Fraternities and Sororities" (RA).[2]

The RA is a 21-page contract that "details the requirements and benefits of

recognition by" WSU.

---

[2] While sororities are subject to many of the same requirements, the rest of this
opinion references only fraternities.

At the outset of the RA, fraternities agree that they are "separate and distinct entities" from WSU and that they "operate independently of one another." Fraternities acknowledge WSU does not supervise, direct, or control their activities and agree WSU "will not be liable for injuries or harm caused to anyone in connection with or arising out of" their activities. They agree to "comply with federal, local and state laws, as well as WSU's Standards of Conduct for Students" (SCS), and to be "accountable for the conduct of its individual members, residents, and guests." Fraternities agree it is an RA violation "for minors to consume alcohol on [their] property or at [their] functions, regardless of the function's location." And the RA mandates the fraternities "that house [first-year students] shall be alcohol and drug free locations and are prohibited from having alcohol in any form on their property at all times."

Under the RA, fraternities are expected to "maintain membership in one of the five university recognized Greek Councils/Associations," work with an assigned "professional from the CFSL," provide the CFSL with administrative information, and "maintain monthly communication with the CFSL." They are also expected to carry liability insurance and "coordinate with the CFSL to ensure a current certificate of insurance . . . is on file."

Fraternities acknowledge that they "may be held accountable" for the behavior of their members and guests on their premises, at their sponsored events, "or when a group including significant numbers of members or guests violates University policies." They also accept responsibility "to identify foreseeable problems that may arise and to take timely corrective action" and,

when appropriate, "to ask for assistance from University offices," including WSU police, the CFSL, the WSU Office of Student Conduct, "Student Involvement," or "outside agencies (police, fire department, ambulance)." WSU "may take into account the repeated occurrence of relevant other incidents involving the organization" when "determining whether an organization or its officers failed to take reasonable precautions."

As part of the RA, fraternities agree to comply with Washington law and WSU's antihazing policy. "Hazing," under the law,

> includes any method of initiation into a student organization . . . that causes, or is likely to cause, bodily danger or physical harm, or serious mental or emotional harm, to any student or other person attending a public or private institution of higher education.[3]

WSU's policy mandates that no student organization "may conspire to engage in hazing or participate in hazing of another."[4] The policy also directs new member activities by requiring, among other things, that there is no hazing "in any form[,] neither as part of the new member program nor as acts by individual members"; that a fraternity's "initiation is to be a positive, educational experience for all involved"; that there are no new member activities between midnight and 8:00 a.m. Monday through Friday; and that all "activities associated

---

[3] Former RCW 28B.10.900 (1993). The legislature amended the definition of "hazing" in 2022, but because this incident occurred in 2019, we cite the 1993 version of the statute that was in effect at that time. LAWS OF 2022, ch. 209, § 1. Further, while former RCW 28B.10.900 uses the term "institution of higher education," we use that term interchangeably with the terms "university" and "college."

[4] The policy notes "hazing" may also include:

Abuse of alcohol during new member activities; striking another person whether by use of any object or one's body; creation of excessive fatigue; physical and/or psychological shock; morally degrading or humiliating games or activities that create a risk of bodily, emotional, or mental harm.

in any way with new members must be alcohol free." Washington law also prohibits hazing by making it punishable as a misdemeanor against individuals and imposing strict liability against organizations that knowingly permit hazing.[5]

As set forth under the RA, the CFSL expects each fraternity to "maintain a minimum of four (4) undergraduate members" but "reserves the right to support and offer assistance" to fraternities "that fall below" this requirement. The CFSL will extend such support based on "cooperation and communication" with the fraternity that includes a letter of support, a detailed action plan, a letter of explanation, and approval from the CFSL director.

Fraternities also agree to abide by WSU's drug and alcohol policy, which forbids students from distributing alcohol to anyone under age 21 and from drinking or possessing alcohol if they are under the age of 21. Further, no student can drink or possess alcohol "regardless of age if alcohol is prohibited at the location." This policy cautions all students to "[r]emember you are accountable to the [SCS] whether you are on campus or off campus and during University breaks." In pertinent part, the policy cautions fraternities that "[a]lcohol consumption is prohibited entirely during ANY social event on chapter property," that "[a]ll social events on chapter property must be alcohol free," and that "[a]ll off-property social functions where alcohol is present require a third-party vendor to serve alcohol, provide security, and verify legal age."

---

[5] Former RCW 28B.10.901 (1993); *see also* RCW 28B.10.902. In 2023, the legislature amended RCW 28B.10.901 and renamed it the Sam Martinez Stop Hazing Law. LAWS OF 2023, ch. 196 § 1. Again, we cite the 1993 version of the statute.

Under the RA, each fraternity enjoys more than 20 "benefits as a result of recognition by" WSU. A few of these benefits are "[a]ccess to a student organization financial account," "[a]dvisement and other services" from the CFSL, "[o]rganizational advocacy by the CFSL," "[i]nclusion in all marketing materials from the CFSL," use of "the University's name when identifying the fraternity or sorority in print and other media," use of space in the CFSL, and "[a]ccess to resources for membership recruitment including a provision of mailing lists for recruitment purposes."[6] The CFSL also maintains a website with information about fraternities and the benefits of joining.[7] And the website provides a confidential portal where the public can report hazing incidents.[8]

2. Fraternity Housing

Most first-year students at WSU "are required to live in organized living groups which are officially recognized by the university . . . for one academic year."[9] Recognized fraternities are eligible to house first-year students in an off-

---

[6] Other benefits include a mailbox, philanthropy funds "collected by CougCard/ RSO Financial Services for disbursement," room reservations "at a free or discounted rate," ability to participate "in University-sponsored events," leadership development and educational opportunities through retreats, administrative support such as "gathering and ranking of Chapter grades" and "organization of rosters," eligibility for the "annual Arete Awards," all rights and benefits provided in the SCS, "[m]embership within a governing council," participation in community-sponsored events, social functions with other recognized chapters, "[b]i-annual meetings and trainings for alumni," quarterly meetings "for Chapter advisors and house corporation presidents," training and support for "Live-In Advisors and House Directors," and "[a]dvisement on risk management and Chapter operations."

[7] While the CFSL promotes Greek organizations generally, it does not recruit students for any particular fraternity.

[8] The CFSL also publishes a "report card" that provides specific information about a fraternity's membership, conduct, and status.

[9] WAC 504-24-030(2).

campus "chapter facility"[10] if they enter into a "University Approved Housing Standards Agreement" (UAH) and employ a "Live-In Advisor or House Director" who resides in the chapter house and manages its daily operations.[11]  The UAH says that "[t]he entire chapter property must be free of alcohol and illegal drugs at all times" and notes that "UAH status is continually reviewed to ensure compliance with each of the items submitted in the application and the conditions in this agreement."  It also mandates the WSU Center for Community Standards (CCS) to investigate all violations of the agreement.[12]

If the CCS finds a violation of the RA or UAH—no matter whether the conduct occurred on or off campus[13]—the CCS will notify the CFSL, which will determine the appropriate sanction.  The sanctions may include "warnings, reprimands, educational programming, restitution for property damage, monetary

---

[10] This is the location where fraternities house their members.

[11] A brief history of this housing framework is warranted.  In 2012, WSU formed the "Presidential Task Force on Alcohol Education and Prevention" (Task Force) to "examine strategies and tactics to curb alcohol misuse" by students.  In 2013, the Task Force informed WSU's Board of Regents that fraternities and sororities were a "High Risk Group and Culture" whose members were "[t]wice as likely to binge drink" and "[m]ore likely to experience alcohol related problems."  And although one of the Task Force's recommendations was to "gradually phase out fraternity houses as eligible" for first-year housing, the CFSL opposed the recommendation for fear "it would adversely affect the health of the Greek system" by "decreasing membership" and "decreasing the numbers of people living within houses."  Instead, the CFSL proposed making only alcohol-free fraternities eligible to house first-year students and requiring them to employ a house director.  WSU ultimately chose the CFSL's proposal even though the Task Force acknowledged that studies showed "fraternities required to have alcohol-free fraternity housing just found other ways to host social events where alcohol was provided."

[12] CCS also tracked incident reports on hazing and ran weekly reports on Greek-affiliated students to advise the CFSL on emerging trends.

[13] The SCS "apply to off-campus behavior if that behavior adversely affects the health and/or safety of the university community or pursuit of the university's mission."

fines, probation, suspension, withdrawal of WSU recognition, or withdrawal of . . . first-year [student] housing privileges."

3. Gamma Chi's Recognition and History

Gamma Chi is the WSU Pullman chapter of Alpha Tau Omega Fraternity, Inc. (ATO National), a nonprofit corporation that operates as a national fraternity.[14]  Originally chartered in May 1911, Gamma Chi is subject to ATO National's "Chapter Minimum Guidelines of Operations," which determines the organization of the chapter, membership eligibility and recruitment, and health and safety rules.  ATO National also forbids hazing during "pledgeship or membership," "whether on or off fraternity premises."  Its subsidiary, Richmond Property Group Ltd. (RPG), bought, managed, and leased the Gamma Chi house.[15]  At all times, ATO National could revoke or suspend Gamma Chi's charter.

Although Gamma Chi was "the third fraternity on campus" and had been recognized by WSU for more than 100 years, its chapter house was actually located off WSU's campus in an area "commonly referred to as Greek Row." Gamma Chi members also had access to a "live-out"[16] they called "Delta Chi" or

---

[14] We use "Gamma Chi" and "ATO" interchangeably to refer to the WSU Pullman chapter.  We refer to the national organization as "ATO National."

[15] RPG employed Gamma Chi's live-in advisor or house director.

[16] "Live-outs" are private residences rented by older fraternity members and are loosely, but "not formally," affiliated with a fraternity.  The CFSL "understand[s] that all of our [fraternal] organizations have live-outs, because the chapter facility is not large enough to house the full membership."

"D Chi," located "across the street" from the chapter house.[17] Gamma Chi used the live-out to host social events to avoid WSU's prohibition on alcohol. WSU knew that "socialization" often "happens at those live-out facilities" and acknowledged that its "jurisdiction" included "responding to reported concerns for off-campus spaces." Indeed, WSU often investigated Gamma Chi for alleged violations of the SCS, RA, and alcohol and antihazing policies.

In February 2013, following a hearing, the WSU Conduct Board found Gamma Chi violated the SCS when it recklessly endangered its members by having them "deal with raw sewage without . . . protective gear[,] boots, clothing, masks, eye protection and rubber gloves." The board also found Gamma Chi hazed its pledges, violated the alcohol policy, and failed to "inform members and pledges of the rules outlined in the [RA]." So, the Conduct Board sanctioned Gamma Chi with the "[l]oss of chapter recognition at least until Spring semester 2014." But it allowed Gamma Chi to petition to regain recognition in December 2013 and, if successful, receive "two years probation to follow."

Gamma Chi administratively appealed the sanction on various grounds, but the WSU Appeals Board affirmed the Conduct Board's decision. Even so, in April 2013, WSU President Elson Floyd modified Gamma Chi's sanction to "probation through December 31, 2013." Floyd conditioned the modification on

---

[17] During the time Sam was at WSU, about 10 Gamma Chi members and another 10 or so members of the Sigma Nu Fraternity rented the Delta Chi live-out. We use the terms "live-out," "Delta Chi," and "D Chi" interchangeably to identify the private residence.

Gamma Chi following several "remedial and instructive measures."[18]

In October 2015, the Pullman Police Department reported to WSU that Gamma Chi "was hosting an event at an ATO live-out, and ATO members (who are minors) returned to the Chapter house to retrieve alcohol that they had stored on Chapter property." WSU investigated this incident and also reported it to ATO National. The ATO National Judicial Review Board then conducted a hearing on the incident and sanctioned the offending Gamma Chi member with (1) removal from the chapter house, (2) revocation of his "Social Chairman" position, (3) giving the chapter members an oral presentation on alcohol education, and (4) social probation for the rest of the 2015-2016 academic year. After ATO National imposed the sanctions, WSU closed its investigation into the allegations that Gamma Chi violated the SCS.

In March 2016, WSU received a report alleging that members of Gamma Chi "physically assaulted . . . an ex member of their house" under the "belie[f] he tried to get them in trouble because their house brutal [sic] hazes." WSU tried to contact the reporting student but concluded that "there was insufficient information to warrant further conduct proceedings" after the complainant stopped responding to its requests for an interview. WSU closed its investigation into the matter.

---

[18] Those remedial and instructive measures included meeting with a CFSL staff adviser twice each semester, completing additional education programming designated by the CFSL by September 30, 2013, and, beginning August 2013, submitting a written report to the CFSL by the end of each month "summarizing all new member activities and verifying that such activities are alcohol free."

In January 2017, WSU learned of a video posted online in November 2016 of a Gamma Chi member "allegedly consuming alcohol on the Chapter's property." In a subsequent letter, WSU reminded Gamma Chi that it had "applied [for] and received [UAH] for the 2016-2017 academic year," that it had "agreed to be compliant with the WSU Alcohol and Drug Policy[,] and that Chapter property would remain alcohol-free." WSU notified Gamma Chi that it would be investigating the incident.[19]

In May 2017, a parent reported that her first-year son, who chose to pledge Gamma Chi along with his friend, "told [her] numerous stories of physical and emotional abuse." The parent gave several examples of "health risks" and "harass[ment]" her son witnessed, including his friend, who was "forced to drink large quantities of alcohol and forced to withstand various forms of aggressive hazing," which caused him to leave WSU "because the whole situation had ruined his college experience and he was being harassed by the members even though he had left." The reporting parent's son "continued in the fraternity for around two months until he couldn't take it either and chose to leave."

The CFSL notified ATO National of the parent's "quite concerning" allegations and offered to partner with ATO National through the investigation into Gamma Chi's potential student conduct violations. Ultimately, WSU determined there was "insufficient information" to find Gamma Chi "responsible for violating any of the [SCS]."

---

[19] The outcome of this investigation is not part of the record on appeal.

Several months later in August 2017, WSU Interim Assistant Vice President for Student Affairs/Dean of Students Kathleen MacKay notified the CFSL about "the need to have proactive conversations with ATO" to let "them know what we're concerned about." By November 2017, MacKay felt "like we should have the visit to ATO [ASAP]." WSU administrators then met with Gamma Chi students and alumni in December 2017 to discuss WSU's concerns. The CFSL reiterated that the "intent behind this [meeting] was to help folks understand that people are talking about ATO, and that it's not always positive."

In February 2018, ATO National performed a "membership review" of Gamma Chi that included interviews and "[u]nannounced drug testing." WSU worked with ATO National and arranged facilities for this review. The review led ATO National to expel 38 Gamma Chi members from the fraternity.

Despite the February 2018 review and expulsions, that same month, a student found Gamma Chi's incoming president Luke Hawksford sleeping and intoxicated outside a residence hall. WSU investigated this incident and Hawksford admitted that he had consumed alcohol at Gamma Chi's live-out house. WSU sanctioned Hawksford with probation for a year and required him to "complete an alcohol/drug education meeting." And in November 2018, a "clearly intoxicated" student sustained a head injury after falling during an on-campus philanthropy event at the WSU pool. The student needed stitches for the inch-deep wound on his head. The student later admitted to drinking at Gamma Chi's live-out house before the event.

In January 2019, 19-year-old Hawksford was Gamma Chi chapter president, and he executed and bound the fraternity to the terms of the RA. WSU later approved Gamma Chi's UAH, which allowed it to house first-year students for the 2019-2020 school year.

In March 2019, Gamma Chi Chapter Advisor and alumni board of trustees (BOT) member Paul Wiggum contacted the CFSL director and other WSU administrators about risk management concerns over Gamma Chi's live-out house. At this meeting, Hawksford shared that he "was concerned about . . . keeping [first-year students] out of the D Chi house [during] parties there" and that he "didn't like the idea of D Chi to begin with." He "especially didn't like the idea of [first-year students] living there" or "just being there in general."

After the March 2019 meeting, Wiggum shared with the attendees his "take aways," including the need to "meet with ATO and Sigma Nu Alumni leaders and Chapter Presidents (CFSL could participate/facilitate)," meet with Gamma Chi members residing at the live-out house "to lay out expectations and responsibilities in order to maintain their ATO Membership," "provide CFSL with [a] list of names of Greek (ATO/Sigma Nu) residents," encourage both chapters to disallow first-year students from residing at the live-out house, "NOT hold ATO/Sigma Nu events" at the live-out house, encourage social chairs to plan "Chapter social events at remote, dispersed smaller live out or off campus venues," and "require residents and guests to not display or wear fraternity symbols, logos, [or] Greek letters." The CFSL director responded, "I understand that this is going to be hard for the chapter, particularly to manage and

enforce . . . . I think that's a part of what it means to be an ATO at WSU, doing what is right, even if it's the harder thing to do."

Despite these concerns, Hawksford admitted that "Gamma Chi did nothing to prevent minors from consuming alcohol at the parties it held at D Chi during the time [he was] president," and that "part of the reason that the parties were held at D Chi [was] to conceal from the university that alcohol was being served to minors." Similarly, despite the "knowledge that it was against the law and against ATO policy and against the student code of conduct," Hawksford said that "Gamma Chi continued to haze its pledges."

In August 2019, WSU received several incident reports involving Gamma Chi and its live-out house. First, Pullman police officers reported finding a first-year Gamma Chi member intoxicated and sleeping on the sidewalk near the live-out house. Next, a second-year Gamma Chi member was contacted by Pullman police officers on the front lawn of a house on Greek Row while holding a can of beer. He tried to run away from the officers, and when they caught him, they found cocaine. Finally, a parent told WSU that Sigma Nu was hazing pledges with alcohol at the shared live-out house. WSU imposed an "interim loss" of Sigma Nu's recognition.[20]

By fall 2019, Gamma Chi had roughly 40 "active" members and 30 to 35 pledges and held parties at the live-out house "at least once a week." And when

---

[20] WSU later amended Sigma Nu's sanction to probation that forbid it from holding "new member activities" and from hosting or attending "any social events involving alcohol."

the parties at the live-out house "winded down[,] . . . people went back to the chapter house" and continued to "consume[ ] alcohol."

4. Sam at Gamma Chi's Big-Little Event

Sam graduated from high school in June 2019 and enrolled in WSU for the 2019 fall semester. After Sam graduated high school, members of Gamma Chi reached out and began recruiting him to join the fraternity.

In summer 2019, Sam and his parents attended a WSU first-year student orientation where WSU representatives spoke about the benefits of fraternities and provided written materials that "promoted" fraternities "as places where students could make friends, learn leadership skills and participate in community service."[21] They also toured the Gamma Chi chapter house. Sam's mother "searched the WSU website" for "information about the Greek System at WSU generally and at Gamma Chi specifically" but "did not find information about Gamma Chi's disciplinary history." By late July, Sam decided to pledge Gamma Chi.

On November 11, 2019, shortly before 9:00 p.m., active ATO members summoned Sam and the other pledges to clean the live-out house. Once the pledges arrived at the live-out house, the active members surprised them with Gamma Chi's annual "Big-Little" event. The Big-Little event was a ritual in which the pledges—the "little" brothers—learned the name of their chapter mentor— their "big" brother—and were "put into their Greek family." Each big brother was

---

[21] According to Sam's mother, "WSU did not share information it had about what we later learned was a culture of excessive alcohol consumption and hazing prevalent in the WSU Greek system."

assigned one or two little brothers and required to bring a "family drink" to celebrate their "new family." Sam's assigned big brother was Wesley Oswald. Oswald brought a "[h]alf gallon of spiced rum" for his family of three to drink.[22]

During the ritual, Sam drank straight from the bottle. After 30 to 45 minutes in the live-out house, the event moved to Gamma Chi's chapter house, where the drinking continued. Sam "tried to shotgun a beer" and drank "clear hard alcohol." He began "slurring his words" and "lost coordination." After seeing Sam "getting visibly more intoxicated," Oswald "cut him off" around 11:00 p.m., telling Sam, " 'Hey, let's take a break for a little bit.' "

Sam eventually passed out on a couch in Oswald's room. "He was asleep for a while, woke back up, and was still visibly drunk." So, Oswald and another fraternity member carried Sam to the bathroom and tried to force him to vomit for 5 to 10 minutes. Their efforts failed. A few people then helped Oswald move Sam to the basement, "where a variety of pledges were already asleep." They placed Sam on a couch, where he remained "for the rest of the night." Oswald said he checked on Sam "two to three times" before going to bed around 3:00 a.m. on November 12.

Hours later at about 9:00 a.m., Gamma Chi member Soreano found Sam face down on the couch with vomit in his mouth and unresponsive. He called 911 and tried to resuscitate Sam. Paramedics arrived but ceased their efforts to resuscitate Sam soon after. The medical examiner determined Sam died from

---

[22] Oswald had two little brother pledges. Only age 20 at the time, Oswald obtained the spiced rum by having his "roommate, Cole Soreano, who was 21," buy it for him. Oswald later pleaded guilty to furnishing liquor to minors.

"acute ethanol intoxication" at about 4:30 a.m. on November 12, 2019. His femoral blood alcohol concentration measured 0.372. Sam had just turned 19 years old in October.

On November 15, 2019, WSU issued Gamma Chi a notice of interim loss of recognition and later issued written findings of its investigation into Sam's death. The CCS's preliminary findings determined that Gamma Chi members "should have foreseen that behavior constituting a violation [of several university rules and state laws] was likely to occur yet failed to intervene." On May 18, 2020, WSU and Gamma Chi entered into a conduct resolution agreement that terminated WSU's recognition of Gamma Chi through May 2026.[23] Days later, ATO National revoked its charter of Gamma Chi, informing all active members that ATO National "is no longer represented at [WSU]."

5. Litigation Procedural History

In July 2020, the Estate[24] sued WSU, alleging negligence and negligent misrepresentation.[25] WSU moved for summary judgment, arguing that the Estate's claims failed as a matter of law because it "did not owe a legal duty to protect Sam from harm he suffered because of the illegal conduct of other adults

---

[23] The agreement specified that "loss of recognition" means "ATO may not identify itself as an official WSU organization during the loss of recognition period and cannot receive any of the benefits of being an officially recognized student organization."

[24] Sam's parents, Martinez and Houtz, sued individually and as copersonal representatives of Sam's estate.

[25] The Estate also asserted claims against ATO National, Gamma Chi, RPG, Gamma Chi President Hawksford, Gamma Chi Risk Manager Andrew Mischke, Sam's big brother and Gamma Chi Membership Education Chairman Oswald, Gamma Chi Social Chairman Soreano, and Jordan Jameson, the live-in advisor employed by RPG. The Estate settled its claims against all of these defendants and none of them are parties in this appeal.

at a private, off campus establishment."[26]  The Estate opposed the motion, arguing that WSU owed Sam a duty of care (1) under Washington's antihazing statutes, (2) through WSU's special relationships with Sam and Gamma Chi, and (3) arising from WSU's affirmative acts.

On March 11, 2022, the trial court heard WSU's motion.  After considering argument from both parties, it concluded that "[t]here was no 'special relationship' between the plaintiff and the defendant that would create a duty owed to the plaintiff by the defendant."  The trial court granted summary judgment and entered an order dismissing the claims against WSU with prejudice.  The Estate timely appealed.

In February 2023, we stayed the appeal pending the outcome of the Washington Supreme Court's decision in *Barlow v. State*, 2 Wn.3d 583, 540 P.3d 783 (2024) (answering certified questions about recognition of a special relationship between a university and its students giving rise to a duty of care). After the *Barlow* decision became final, we lifted the stay and, at our request, the parties filed supplemental briefs addressing the effect of *Barlow* on this appeal.

ANALYSIS

The Estate argues the trial court erred by granting summary judgment dismissal of its complaint and concluding that WSU owed Sam no duty of care (1) under Washington's antihazing statutes, (2) through WSU's special relationships with Sam and Gamma Chi, and (3) arising from WSU's affirmative

---

[26] WSU also argued that the Estate could not establish the proximate cause element of its negligence claim and that the court should dismiss the Estate's demand for "pre-death pain and suffering damages."  Neither argument is at issue in this appeal, so we do not address them.

acts. We agree WSU owed Sam a duty of care arising out of its special relationship with Gamma Chi.

1. Standard of Review

We review summary judgment orders de novo and engage in "the same inquiry as the trial court." *Elcon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 164, 273 P.3d 965 (2012). In performing this inquiry, we "must view all facts and reasonable inferences in the light most favorable to the nonmoving party." *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 860-61, 93 P.3d 108 (2004) (citing *City of Lakewood v. Pierce County*, 144 Wn.2d 118, 125, 30 P.3d 446 (2001)). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." CR 56(c). " 'A material fact is one upon which the outcome of the litigation depends, in whole or in part.' " *Hisle*, 151 Wn.2d at 861 (quoting *Barrie v. Hosts of Am., Inc.*, 94 Wn.2d 640, 642, 618 P.2d 96 (1980)). We limit our review of a summary judgment order to only the evidence and issues the parties called to the trial court's attention. RAP 9.12.

"In a negligence action the threshold question is whether the defendant owed a duty of care to the injured plaintiff."[27] *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 474, 951 P.2d 749 (1998) (citing *Est. of Kelly v. Falin*, 127 Wn.2d 31, 36, 896 P.2d 1245 (1995)). "The question of duty is dispositive—'No defendant is liable for negligence unless [they are] under a legal duty to use

---

[27] To maintain an actionable negligence claim, a plaintiff must also establish a breach of that duty, resulting injury, and the breach was the proximate cause of the injury. *Folsom v. Burger King*, 135 Wn.2d 658, 671, 958 P.2d 301 (1998).

care.' " *Ehrhart v. King County*, 195 Wn.2d 388, 396, 460 P.3d 612 (2020) (quoting DAN B. DOBBS ET AL., THE LAW OF TORTS § 251, at 1 (2d ed. 2011)). A "duty" is " 'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.' " *Transamerica Title Ins. Co. v. Johnson*, 103 Wn.2d 409, 413, 693 P.2d 697 (1985) (quoting WILLIAM L. PROSSER, HANDBOOK OF THE LAW OF TORTS § 53, at 331 (3d ed. 1964)).

The existence of a duty depends on " 'mixed considerations of logic, common sense, justice, policy, and precedent.' " *Snyder v. Med. Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 243, 35 P.3d 1158 (2001)[28] (quoting *Lords v. N. Auto. Corp.*, 75 Wn. App. 589, 596, 881 P.2d 256 (1994)). Whether a duty exists is a question of law that we review de novo. *Hansen v. Friend*, 118 Wn.2d 476, 479, 824 P.2d 483 (1992); *Munich v. Skagit Emergency Commc'ns Ctr.*, 175 Wn.2d 871, 877, 288 P.3d 328 (2012).

2. Statutory Duty

The Estate claims that WSU owed Sam a statutory duty of care. It argues Washington's antihazing statutes impose a duty on universities to protect its students from hazing. We disagree.

In 1993, the legislature enacted the antihazing statutes of chapter 28B.10 RCW. LAWS OF 1993, ch. 514, §§ 1-4. Former RCW 28B.10.901 (1993) provides:

> (1) No student, or other person in attendance at any public or private institution of higher education, or any other postsecondary educational institution, may conspire to engage in hazing or participate in hazing of another.

---

[28] Internal quotation marks omitted.

(2) A violation of this section is a misdemeanor, punishable as provided under RCW 9A.20.021.
(3) Any organization, association, or student living group that knowingly permits hazing is strictly liable for harm caused to persons or property resulting from hazing. If the organization, association, or student living group is a corporation whether for profit or nonprofit, the individual directors of the corporation may be held individually liable for damages.

RCW 28B.10.902 further mandates:

(1) A person who participates in the hazing of another shall forfeit any entitlement to state-funded grants, scholarships, or awards for a period of time determined by the institution of higher education.
(2) Any organization, association, or student living group that knowingly permits hazing to be conducted by its members or by others subject to its direction or control shall be deprived of any official recognition or approval granted by a public institution of higher education.
(3) The public institutions of higher education shall adopt rules to implement this section.

And RCW 28B.10.903 instructs:

Institutions of higher education shall adopt rules providing sanctions for conduct associated with initiation into a student organization or living group, or any pastime or amusement engaged in with respect to an organization or living group not amounting to a violation of RCW 28B.10.900. Conduct covered by this section may include embarrassment, ridicule, sleep deprivation, verbal abuse, or personal humiliation.

We interpret statutes de novo. *Morgan v. Johnson*, 137 Wn.2d 887, 891, 976 P.2d 619 (1999). Our goal is to "effectuate the legislature's intent." *Bostain v. Food Express, Inc.*, 159 Wn.2d 700, 708, 153 P.3d 846 (2007). "When interpreting a statute, we first look to its plain language." *HomeStreet, Inc. v. Dep't of Revenue*, 166 Wn.2d 444, 451, 210 P.3d 297 (2009) (citing *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007)). We give the words in a statute their common and ordinary meaning. *Garrison v. Wash. State Nursing*

*Bd.*, 87 Wn.2d 195, 196, 550 P.2d 7 (1976). If the language is clear and the meaning is plain, a statute needs no construction, so we will neither read into it things that are not there nor amend it by construction. *King County v. City of Seattle*, 70 Wn.2d 988, 991, 425 P.2d 887 (1967); *HomeStreet*, 166 Wn.2d at 452 (" 'A statute that is clear on its face is not subject to judicial construction.' ") (quoting *State v. J.M.*, 144 Wn.2d 472, 480, 28 P.3d 720 (2001)).

 a. <u>Plain Language</u>

 Under former RCW 28B.10.901, any person attending a university who hazes another is subject to misdemeanor prosecution, any organization that knowingly permits hazing is strictly liable for the harm caused, and the directors of such organizations (that are corporate entities) may be held individually liable for damages. The clear purpose of this statute is to penalize the actors who actually engaged in hazing. It does not penalize or punish universities. Nor is there anything in this statute that applies to educational institutions, just their attendees.

 RCW 28B.10.902(1) and (2) impose administrative discipline that includes loss of "state-funded grants, scholarships, or awards" on a person who hazes another and loss of "official recognition" on any organization "that knowingly permits hazing." The statute also mandates that universities "adopt rules to implement this section." RCW 28B.10.902(3). So, overall, this statute outlines the sanctions that universities may impose on an individual or an organization *after* a hazing incident and requires universities to create rules for administering such discipline. A university's role under this statute is reactive. The plain

22

language of RCW 28B.10.902 does not require universities to undertake proactive efforts to prevent hazing. For example, the statute does not obligate universities to establish safety standards or conduct antihazing training.

Accordingly, we hold that the antihazing statutes impose a duty on universities to create administrative rules to sanction persons and organizations for acts of hazing. Nothing more. The Estate does not dispute that WSU has created such rules. *See* WAC 504-26-206 (prohibiting and defining "hazing" for WSU's SCS).[29]

### b. Implied Cause of Action

"Where appropriate, a cause of action may be implied from a statutory provision when the legislature creates a right or obligation without a corresponding remedy." *Ducote v. Dep't of Soc. & Health Servs.*, 167 Wn.2d 697, 703, 222 P.3d 785 (2009) (citing *Bennett v. Hardy,* 113 Wn.2d 912, 920, 784 P.2d 1258 (1990)). Washington courts use a three-part test to determine whether an implied cause of action is appropriate. *See Bennett*, 113 Wn.2d at 920-21. We must determine

> first, whether the plaintiff is within the class for whose "especial" benefit the statute was enacted; second, whether the legislative intent, explicitly or implicitly, supports creating or denying a remedy; and third, whether implying a remedy is consistent with the underlying purpose of the legislation.

*Id.* (citing *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 823 F.2d 1349, 1353 (9th Cir. 1987)).

---

[29] Because we conclude that the antihazing statutes impose no duty on WSU to be proactive in the effort to prevent hazing, we do not reach WSU's argument that such duty would be barred under the public duty doctrine.

As to the first *Bennett* factor, the Estate points to the antihazing statutes' legislative history—bill reports and legislative testimony—as reflecting a clear intent to protect college students like Sam from hazing. The senate bill report contains the following background:

> Hazing has been viewed as a serious social problem affecting institutions of higher education. This view is particularly strong at those institutions with fraternity and sorority living groups, which sometimes have prescribed initiation rituals required for acceptance into the organization.
>
> Hazing is illegal at institutions of higher education in 28 states. Although some of this state's four-year institutions of higher education have adopted internal antihazing policies, the state of *Washington has no statute specifically* addressing the issue of hazing and *prescribing penalties*.

S.B. REP. ON S.B. 5075, at 1, 53rd Leg., Reg. Sess. (Wash. 1993);[30] *see also*

H.B. REP. ON SUBSTITUTE S.B. 5075, 53rd Leg., Reg. Sess. (Wash. 1993).

Representatives from WSU, Central Washington University, and Eastern Washington University testified before the Senate Committee on Higher Education in favor of the bill, which is summarized as follows:

> Initiation rites into fraternities and sororities on college campuses have resulted in individuals being placed in very dangerous situations. In some cases, serious injury and even death has occurred as a result of hazing of this kind. Twenty-eight other states have moved to control such initiations by *creating the crime of hazing and prescribing penalties for the practice*. *This state should also do this* in order *to protect students, and institutions that might be liable to lawsuits* if such practices occur on their campuses.

S.B. REP. ON S.B. 5075, at 2.[31]

---

[30] Emphasis added.

[31] Emphasis added.

In view of the statutory text and its legislative history, it is clear that the legislature enacted the antihazing statutes to benefit college students subjected to initiation rituals that involve hazing.[32] And Sam was a member of this class. So, the first *Bennett* factor weighs in favor of implying a cause of action.

The same is not true for the second *Bennett* factor—whether the antihazing statutes evidence legislative intent to provide a remedy against a university for failing to protect its students from hazing. In determining whether the legislature intended to grant a right of recovery for statutory violations,

> "we can assume that the legislature is aware of the doctrine of implied statutory causes of action and also assume that the legislature would not enact a remedial statute granting rights to an identifiable class without enabling members of that class to enforce those rights."

*Bennett*, 113 Wn.2d at 919-20 (quoting *McNeal v. Allen*, 95 Wn.2d 265, 277, 621 P.2d 1285 (1980) (Brachtenbach, J., dissenting)). Critically, this factor also "requires us to determine whether legislative intent supports implying the *requested remedy*, rather than any remedy." *Rocha v. King County*, 195 Wn.2d 412, 428, 460 P.3d 624 (2020).

Here, former RCW 28B.10.901 provides a specific remedy against individuals who conspire to haze others (criminal punishment), against any organization, association, or student living group that knowingly permits hazing (strict civil liability), and against the directors of such entities (individual liability). But the antihazing statutes do not provide a tort remedy against a university that

---

[32] We note that in the legislative testimony, the university representatives also sought to protect "institutions that might be liable," such as themselves. S.B. REP. ON S.B. 5075, at 2.

fails to prevent its students from being hazed.  Nor does the legislative history suggest such a remedy.  In short, the provision of specific remedies for acts of hazing is evidence that the legislature intended to limit tort remedies to those who actually participated in hazing—not universities.

When "the legislature includes particular language in one section of a statute but omits it in another, the exclusion is presumed intentional."  *Perez-Crisantos v. State Farm Fire & Cas. Co.*, 187 Wn.2d 669, 680, 389 P.2d 476 (2017) (citing *Millay v. Cam*, 135 Wn.2d 193, 202, 955 P.2d 791 (1998)).  We view the legislature's omission of a tort remedy against universities as intentional.[33]  "No cause of action should be implied when the Legislature has provided an adequate remedy in the statute."  *Cazzanigi v. Gen. Elec. Credit Corp.*, 132 Wn.2d 433, 445, 938 P.2d 819 (1997) (citing *Bennett*, 113 Wn.2d at 920).

Still, the Estate relies on *Swank v. Valley Christian School*, 188 Wn.2d 663, 398 P.3d 1108 (2017), and *Washburn v. City of Federal Way*, 178 Wn.2d 732, 310 P.3d 1275 (2013), to claim otherwise.  But neither *Swank* nor *Washburn* applies here.

In *Swank*, a student died after suffering a head injury during a high school football game.  188 Wn.2d at 670-72.  His parents sued several defendants,

---

[33] We also note that although the legislature had an opportunity to create a cause of action against universities when it significantly amended the antihazing statutes in 2022 (by adding several new sections) and in 2023 (by modifying former RCW 28B.10.901), it did not to do so.  *See* LAWS OF 2022, ch. 209, §§ 1-6; LAWS OF 2023, ch. 196, § 1.

alleging negligence and a violation of the Lystedt law.[34]  *Id.* at 672.  Our Supreme Court held that "the Lystedt law includes an implied cause of action."  *Id.* at 673.

While analyzing the second *Bennett* factor, our Supreme Court observed that the "legislative concern with youth athlete concussions is clear in the Lystedt law."  *Swank*, 188 Wn.2d at 677.  It then said:

> Despite this clear concern, there is no mechanism in the Lystedt law to enforce the requirements intended to address the risks of youth athlete concussions.  Given the clear legislative concern, it is logical to infer that the legislature intended that there be some sort of enforcement mechanism.

*Id.*  Further, the court explained that the Lystedt law gave volunteer health care providers a "limited immunity," which "recognizes the need for protection against liability, but simultaneously recognizes that the immunity should be limited" and that "[b]y implication, the grant of immunity is evidence of the legislature's intent to imply a cause of action."  *Id.* at 677-78.

Unlike the Lystedt law, the antihazing statutes do not require universities to create and annually distribute material about the risk of hazing.  Nor do they

---

[34] "The purpose of the Lystedt law is to reduce the risk of further injury or death to youth athletes who suffer concussions in the state of Washington."  *Swank*, 188 Wn.2d at 669 (citing RCW 28A.600.190).  Under the Lystedt law:

> Each school district's board of directors shall work in concert with the Washington interscholastic activities association to develop the guidelines and other pertinent information and forms to inform and educate coaches, youth athletes, and their parents and/or guardians of the nature and risk of concussion and head injury including continuing to play after concussion or head injury.  On a yearly basis, a concussion and head injury information sheet shall be signed and returned by the youth athlete and the athlete's parent and/or guardian prior to the youth athlete's initiating practice or competition.

RCW 28A.600.190(2).  The law also requires that "[a] youth athlete who is suspected of sustaining a concussion or head injury in a practice or game shall be removed from competition at that time."  RCW 28A.600.190(3).

direct universities to take other affirmative action "intended to address the risks" associated with hazing. *See Swank*, 188 Wn.2d at 677. Further, the antihazing statutes do not include an immunity provision. As discussed above, former RCW 28B.10.901 provides specific remedies against individuals and organizations that commit or permit hazing. As a result, *Swank* does not apply here.

In *Washburn*, a Federal Way police officer served an antiharassment order on a woman's partner at her request under former RCW 10.14.100(2) (2002).[35] 178 Wn.2d at 739, 756. The woman notified the police of her partner's violent nature and the need for a Korean interpreter. *Id.* at 739-40. At the time of service, the police officer did not use an interpreter, saw the woman inside the home with her partner, did not ask about her safety, handed the partner the antiharassment order, and left. *Id.* at 740. The partner stabbed and killed the woman later that same day. *Id.*

After analyzing former RCW 10.14.010 (1987),[36] our Supreme Court confirmed that the city owed the woman a legal duty to serve her antiharassment

---

[35] "The sheriff of the county or the peace officers of the municipality in which the respondent resides shall serve the respondent personally unless the petitioner elects to have the respondent served by a private party." Former RCW 10.14.100(2).

[36] Former RCW 10.14.010 provides:

The legislature finds that serious, personal harassment through repeated invasions of a person's privacy by acts and words showing a pattern of harassment designed to coerce, intimidate, or humiliate the victim is increasing. The legislature further finds that the prevention of such harassment is an important governmental objective. This chapter is intended to provide victims with a speedy and inexpensive method of obtaining civil antiharassment protection orders preventing all further unwanted contact between the victim and the perpetrator.

order.[37] *Washburn*, 178 Wn.2d at 752, 755-57.  It then held that "[u]nder the legislative intent exception, if the City's discharge of this duty to act, service of the order, constituted 'culpable neglect,' it bears liability in tort."  *Id.* at 757 (citing *Halvorson v. Dahl*, 89 Wn.2d 673, 678, 574 P.2d 1190 (1978)).

The antihazing statutes differ from former chapter 10.14 RCW.  Former RCW 28B.10.901 does not require a university to take affirmative steps to warn students of the risks of hazing or to prevent incidents of hazing from occurring.  By statute, universities are charged with disciplining offenders after the hazing has already occurred.  The intent of the antihazing statutes is unlike the intent that the *Washburn* court recognized in former chapter 10.14 RCW.  The second *Bennett* factor disfavors implying a cause of action against universities.[38]

WSU had no express or implied statutory duty to protect Sam from hazing by Gamma Chi.  Summary judgment was proper on this ground.

3. Common Law Duty

At common law, the general rule is that a party does not have a duty to protect others from the acts of third parties.  *See Hertog v. City of Seattle*, 138 Wn.2d 265, 276, 979 P.2d 400 (1999).  There are several exceptions to this general rule.  *See id.*  The Estate argues that three of those exceptions apply here.  It argues that exceptions to the general rule arise from WSU's special

---

[37] As we discuss later, the *Washburn* court also held that the city owed the woman a common law duty to act reasonably while serving the antiharassment order. 178 Wn.2d at 752.

[38] Because the second *Bennett* factor is dispositive here, we need not address the last factor to decide that the antihazing statutes do not support an implied cause of action.

relationship with Sam, its special relationship with Gamma Chi, and its affirmative acts in promoting fraternity life. We address each exception in turn.

a. Special Relationship with Sam

"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another *unless* . . . a special relation exists between the actor and the other which gives to the other a right to protection." RESTATEMENT (SECOND) OF TORTS § 315(b) (AM. LAW INST. 1965).[39] "[A]ll schools, including universities, have a special relationship with their students" under *Restatement (Third) of Torts: Liability for Physical and Emotional Harm* § 40 (Am. Law Inst. 2012). *Barlow*, 2 Wn.3d at 590 n.2.

i. *Restatement (Second)* § 315(b)

The Estate argues WSU had a special relationship with Sam, giving rise to a duty of care to protect him from hazing under *Restatement (Second)* § 315(b). But *Barlow* squarely rejects this argument.

In 2017, Madeleine Barlow moved to Pullman to begin her first year of college at WSU. *Barlow*, 2 Wn.3d at 587. Shortly after Barlow's arrival, fellow WSU student Thomas Culhane raped her "at a party she attended at his off-campus apartment." *Id.* Barlow sued WSU in superior court and asserted a negligence claim that "rested on WSU having a special relationship with its students, alleging a duty to both control and protect the students, with the

---

[39] Emphasis added.

knowledge of Culhane's past sexual misconduct making the harm foreseeable."
*Id.* at 588.[40]

WSU removed the case to a federal district court and moved for summary judgment dismissal, "arguing that Barlow's claims failed as a matter of law because her injury occurred off campus where the school had no control and no duty." *Barlow*, 2 Wn.3d at 588. The federal district court granted WSU's motion, and Barlow sought review before the United States Court of Appeals for the Ninth Circuit. *Id.* The Ninth Circuit certified two questions about the negligence claim to the Washington Supreme Court:

> (1) "Does Washington law recognize a special relationship between a university and its students giving rise to a duty to use reasonable care to protect students from foreseeable injury at the hands of other students?" and (2) "If the answer to question 1 is yes, what is the measure and scope of that duty?"

*Id.* at 588-89 (quoting Ord. Certifying Questions to the Wash. Sup. Ct. at 2 (9th Cir. June 23, 2022)).

In answering the certified questions, our Supreme Court explained the "existence of a *Restatement (Second)* § 315(b) duty requires control over a vulnerable person's actions, essentially a complete dependence in order to live." *Barlow*, 2 Wn.3d at 592; *see Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 51, 929 P.2d 420 (1997) ("the special relationship between a group home for the developmentally disabled and its vulnerable residents creates a duty of reasonable care, owed by the group home to its residents, to protect them from

---

[40] WSU had granted Culhane's request to transfer from its Vancouver campus to Pullman after he received two complaints of sexual misconduct and the university found he violated the SCS. *Barlow*, 2 Wn.3d at 587-88.

all foreseeable harms"). The court noted that "level of control simply does not exist here," where Barlow "was not a vulnerable adult lacking the faculties to care for herself" and WSU "had no power to control her decisions or actions away from campus." *Barlow*, 2 Wn.3d at 592. The court said:

> We have more recently explained what creates a "special relationship" and rejected an invitation to broaden the common law duty. In *Turner v. Department of Social & Health Services*, 198 Wn.2d 273, 286-87, 493 P.3d 117 (2021), we stated that *Restatement (Second)* § 315(b) creates a heightened duty to protect someone in a situation where that person is "helpless, totally dependent, or under the complete control of someone else for decisions relating to their safety." The duty is not based on custody but on the dependence of the victim. Where this type of special relationship is formed, it is accompanied by a heightened duty of care to protect the person from any foreseeable harm, equating that duty to strict liability. If the relationship lacks the traits of dependence and control, we held that no liability exists. *No similar duty exists between a university and its students* under which a *Restatement (Second)* § 315(b) special relationship is implicated.

*Id.* at 592-93.[41]

We are bound to follow Supreme Court precedent. *100 Va. Ltd. P'ship v. Vertecs Corp.*, 158 Wn.2d 566, 590, 146 P.3d 423 (2006). Because the Estate presents no evidence that Sam was helpless, totally dependent, or under the complete control of WSU for decisions related to his safety, WSU did not owe Sam a duty under *Restatement (Second)* § 315(b).

Still, the *Barlow* court answered "yes" to the first certified question, saying a special relationship between a university and its students exists. But it concluded that the relationship "is defined and anchored in the common law as

---

[41] Emphasis added.

provided in *Restatement (Second) of Torts* § 344 (Am. Law Inst. 1965)," not in §

315(b). *Barlow*, 2 Wn.3d at 586-87. Under *Restatement (Second)* § 344:

> A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
> > (a) discover that such acts are being done or are likely to be done, or
> > (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

The duty, arising from this special relationship, "exists where a student is on

campus, similar to a business invitee, or involved in university sponsored

activities." *Barlow*, 2 Wn.3d at 587.

In answer to the second certified question about the scope of WSU's duty,

the court said that "the duty exists within the campus confines or university

sponsored and controlled events" and that "[t]he scope of the duty is based on a

student's enrollment and presence on campus." *Barlow*, 2 Wn.3d at 587. But

the court further defined and limited the scope of this duty. It first noted that a

case from the Massachusetts Supreme Court matched its view of the special

relationship between a university and its students:

> "When a college or university has actual knowledge of conditions that would lead a reasonable person to conclude that a *student on campus is in imminent danger of serious physical harm* due to alcohol intoxication, and so intoxicated that the student is incapable of seeking help for him- or herself, the college or university has a duty to take reasonable measures to protect that student from harm."

*Id.* at 595 (quoting *Helfman v. Northeastern Univ.*, 485 Mass. 308, 321, 149

N.E.3d 758 (2020)). *Barlow* then said that *Helfman* "cannot be read to support

expanding the duty to university students when they engage in off-campus activities." *Id.* at 596.

> Similarly, *Barlow* pointed to a California Supreme Court case that
>
> expressly recognized the limit of the special relationship stating, "[W]e conclude postsecondary schools *do* have a special relationship with students while they are engaged in activities that are part of the school's curriculum or closely related to its delivery of educational services."

*Barlow*, 2 Wn.3d at 596[42] (quoting *Regents of Univ. of Cal. v. Superior Court of L.A. County*, 4 Cal. 5th 607, 624-25, 230 Cal. Rptr. 3d 415, 413 P.3d 656 (2018)). The *Regents* case made clear that because of this special relationship, " 'colleges generally owe a duty to use reasonable care to protect their students from foreseeable acts of violence *in the classroom or during curricular activities*.' " *Id.*[43] (quoting *Regents*, 4 Cal. 5th at 627). Adopting this approach, *Barlow* said this "limitation applies here and is consistent with our cases recognizing the scope of the duty." *Id.* at 596-97.[44]

Finally, *Barlow* provided the reasoning and scope of the duty a university owes to its students under *Restatement (Second)* § 344 as follows:

> Because no ability to control off-campus, non-school-sponsored interactions exists, the duty does not extend to the choices or activities under a student's control. *A university's duty is limited to where a student is on campus for school related purposes or participating in a school activity.*

2 Wn.3d at 597.[45]

---

[42] Alteration in original.

[43] Emphasis added.

[44] Citing as examples *Turner*, 198 Wn.2d at 273, *Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d 192, 943 P.2d 286 (1997), and *Niece*, 131 Wn.2d at 39.

[45] Emphasis added.

In supplemental briefing following *Barlow*, the Estate claims that WSU has a duty under *Restatement (Second)* § 344 because Sam was participating in a WSU-sponsored and controlled fraternity activity. Specifically, the Estate points to ways in which WSU and the CFSL promoted and encouraged participation in fraternal organizations. But *Barlow* does not establish such a broad duty.

While *Barlow*'s answers to the certified questions are broad—seeming to show that "university sponsored activities" or "university sponsored and controlled events" trigger the duty—its holding and how it defined the scope of the duty were not. *See* 2 Wn.3d at 587. Rather, the holding in *Barlow* is more narrow. It limits a university's duty under *Restatement (Second)* § 344 to when (1) a student is on campus for school related purposes or (2) a student is on campus participating in school activity. *Id.* at 597-98. For purposes of this duty, "school related purposes" or "school activity" is limited to " 'activities that are part of the *school's curriculum* or *closely related to its delivery of educational services*.' " *Id.* at 596-97[46] (quoting *Regents*, 4 Cal. 5th at 627).

Here, Sam's death occurred following a hazing ritual at Gamma Chi's live-out house and the chapter house. This event did not take place on WSU's campus. Nor was this event part of WSU's curriculum or closely related to WSU's delivery of educational services. And, even given the broadest reading to which it is reasonably susceptible, WSU's act of promoting participation in fraternities does not qualify as part of its educational program. The Estate offers no authority to contend otherwise, and we see no basis to say here that WSU

---

[46] Emphasis added.

owed Sam a duty under *Restatement (Second)* § 344.[47]  The Estate's claim on this ground fails.[48]

    b.  <u>Special Relationship with Gamma Chi</u>

No duty exists "to control the conduct of a third person as to prevent him from causing physical harm to another unless . . . a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct."  RESTATEMENT (SECOND) § 315(a).  The Estate contends that a special relationship existed between WSU and Gamma Chi such that WSU had a duty to control or mitigate Gamma Chi's conduct under *Restatement (Second)* § 315(a).[49]  We agree.

We begin by, again, turning to *Barlow*.  There, Barlow argued that WSU had a duty to control Culhane under *Restatement (Second)* § 315(a) based on what it knew about him.  *Barlow*, 2 Wn.3d at 593.  In disagreeing with this argument, the court reasoned:

> In *Volk v. DeMeerleer*, 187 Wn.2d 241, 256, 386 P.3d 254 (2016), we said that a *Restatement (Second)* § 315(b) duty of

---

[47] *See Cornelius v. Wash. State Univ.*, No. 84657-4, slip op. at 12, 16 (Wash. Ct. App. Jan. 21, 2025) (a contemporaneous opinion similarly holding that WSU owed no duty under *Restatement (Second)* § 344 to a student who was hazed at an off campus fraternity).

[48] Because we determine off-campus fraternity activities do not qualify as on-campus school activities, we also reject the Estate's claim that WSU had a special relationship with Sam under *Restatement (Third)* § 40.  *See* RESTATEMENT (THIRD) § 40 cmt. l.

[49] The Estate also claims on appeal that WSU had a duty to control Gamma Chi under *Restatement (Second) of Torts* § 319 (Am. Law Inst. 1965), but it did not make this argument below.  Generally, we do not consider summary judgment issues on appeal that were not raised in the trial court.  RAP 9.12.  But even if we did consider the argument now, we would reject it because our Supreme Court has said *Restatement (Second)* § 319 "has not been applied outside of the officer/offender context" and does not "apply in the situation presented here, at an off-campus party."  *Barlow*, 2 Wn.3d at 594-95.

reasonable care exists "on a showing that a definite, established, and continuing relationship exists between the defendant and the third party." We also remarked that in order for a special relation under *Restatement (Second)* § 315(a) to exist, the ability to control the third party must exist. [*Id.* at 264]. We then held that a mental health professional and a patient have a special relationship pursuant to *Restatement (Second)* § 315(a), and thus the professional has a duty to take reasonable precautions to help any foreseeable victims. We acknowledged that the nature of the doctor-patient relationship gave the doctor insight into the dangerousness of the patient and provided the doctor with the identity of possible victims, but it also gave the doctor sufficient control of the third party to manifest the duty. Such a relationship does not exist between a university and its students, where interactions are far less intimate and consistent. Looking at this case, the university did not have sufficient insight into the potential dangerousness of Culhane, the university would not have been able to identify Barlow as a potential victim, and the university could not exercise sufficient control of Culhane to manifest the duty.

*Id.* at 593-94.

*Barlow* makes clear that a university does not have a duty to control the actions of its *individual students*. But a fraternity is not a student. So, *Barlow* does not control the relationship here. And the evidence shows that the nature of WSU's relationship with Gamma Chi was such that WSU had sufficient insight into the dangerousness of Gamma Chi's conduct, could identify its potential victims, and could exercise sufficient control over Gamma Chi to manifest a duty under *Restatement (Second)* § 315(a).

i. Nature of the Relationship

The first step in determining whether WSU owed a duty under *Restatement (Second)* § 315(a) is to consider whether the evidence on record, viewed in favor of the Estate, establishes "a definite, established, and continuing relationship" between WSU and Gamma Chi. *See Volk*, 187 Wn.2d at 254, 256.

No Washington court has clearly defined the boundaries of what amounts to a definite, established, and continuing relationship. And we recognize that such a relationship develops only under unique circumstances.[50] But "the college environment is unlike any other." *Regents*, 4 Cal. 5th at 625. And within that environment, WSU and Gamma Chi developed such a unique relationship.

WSU began recognizing Gamma Chi in May 1911. We infer from the record that this recognition was continuous from then until Sam's death in 2019, resulting in a 108-year relationship. At some point, although the record does not show when, WSU began requiring fraternities seeking recognition to enter into a written agreement like the RA—a contract that binds both parties to its terms.[51]

The parties do not point to any statutory or decisional law that requires WSU to recognize fraternities such as Gamma Chi. Nor do the parties cite any authority suggesting that Gamma Chi may exist only when recognized by WSU.[52] So, the evidence reflects that WSU and Gamma Chi voluntarily participated in the recognition process and memorialized the terms of their relationship in the RA.

---

[50] Our Supreme Court has recognized a *Restatement (Second)* §§ 315(a) and 319 special relationship in the mental health and parole/probation settings. *See, e.g.*, *Volk*, 187 Wn.2d at 262-63 (psychiatrist and outpatient); *Hertog*, 138 Wn.2d at 276, 281 (probation counselor and probationer); *Taggart v. State*, 118 Wn.2d 195, 219, 822 P.2d 243 (1992) (parole officer and parolee); *Petersen v. State*, 100 Wn.2d 421, 427-28, 621 P.2d 230 (1983) (psychiatrist and inpatient).

[51] WSU has used this recognition process since at least 2007. *See Alpha Kappa Lambda Fraternity v. Wash. State Univ.*, 152 Wn. App. 401, 404-05, 216 P.3d 451 (2009). In *Kappa Lambda*, WSU revoked its recognition of a fraternity for violating its alcohol use rules in 2007. *Id.* at 406. On appeal of that sanction, the court explained that "[i]n order to be recognized by WSU, a fraternity must sign and comply with the terms of the fraternal organization agreement." *Id.* at 405.

[52] The fact that ATO National terminated Gamma Chi's charter does not mean that WSU's recognition was necessary for Gamma Chi to exist.

As described above, the RA sets forth defined and established terms that create a mutually beneficial relationship between WSU and Gamma Chi. Under the RA, Gamma Chi received, among others, the benefit of having access to WSU's facilities, organizational and recruiting activities, university-sponsored trainings and events, and use of WSU's name and trademarks when identifying the fraternity in print or other media. In exchange for these benefits, Gamma Chi agreed to abide by several requirements, including compliance with WSU policies and state and federal laws. The RA made clear that it was a violation for minors to consume alcohol on Gamma Chi property or at Gamma Chi's functions, "regardless of the function's location."

As a recognized fraternity, Gamma Chi was eligible for approval to house first-year students, who are required to live in WSU-approved housing. To ensure the safety of those students, WSU required Gamma Chi to execute the UAH. After executing the UAH, Gamma Chi became an approved housing option and needed to maintain its chapter house "free of alcohol and illegal drugs at all times." Under this agreement, WSU agreed to "continually" review Gamma Chi's "UAH status . . . to ensure compliance with each of the items submitted in the application and the conditions in this agreement."[53]

In this relationship, WSU assisted Gamma Chi with recruiting pledges by sharing the names and contact information of newly enrolled first-year students. WSU proactively tracked incident reports to see if individuals were Greek-

---

[53] Even though WSU claimed in the RA that it "does not supervise, direct or control" Gamma Chi, it also declared in the RA that "[t]his Agreement is not the sole agreement between the University and this Chapter and shall not be construed as such."

affiliated to identify trends so that it could "pass that information on to the [CFSL], so that they could be aware of it and potentially include it in their advising conversations with the organization." Gamma Chi regularly met with assigned staff from the CFSL. And it needed to maintain monthly communication with the CFSL and share administrative information.

Gamma Chi also interacted with other WSU administrators over the years to discuss alcohol misuse, hazing, and risk management associated with its live-out house. For instance, in August 2019, Gamma Chi's president e-mailed Gamma Chi alumni advisors and WSU administrators about the live-out house:

> "As we all know this live[-]out puts the chapter at risk in multiple ways, so I'm thankful to have a team full of experienced individuals to help reduce that risk. Please feel free to reach out to me personally with any ideas, comments or suggestions. My phone number is posted below, you can reach me there or through e[-]mail."

Gamma Chi was also tasked to "partner with" WSU police and the CFSL when it identified foreseeable problems.[54]

The relationship between WSU and Gamma Chi is unlike WSU's relationship with an individual student, as was the case in *Barlow*. WSU has an undergraduate population of about 20,000 students. WSU does not enter into 20,000 individual RA and UAH contracts with each of its students as it did with Gamma Chi. Individual students are not required to regularly meet and communicate with the CFSL. Nor does WSU voluntarily bind itself to actively monitor an individual student's status to ensure the safety of others as it did with

---

[54] The record contains other examples of consistent and intimate interactions between WSU and Gamma Chi.

Gamma Chi in the UAH. Through its relationship with Gamma Chi, WSU had insight into the dangers of Gamma Chi's hazing activities and permissive use of alcohol. And it could reasonably identify Gamma Chi's student pledges as potential victims of those activities.

Considering WSU's continued recognition of Gamma Chi for over a century and its interactions with the chapter, along with the terms of the RA and UAH, we hold that a defined, established, and continuing relationship existed between WSU and Gamma Chi for purposes of *Restatement (Second)* § 315(a).

### ii. Ability to Control

For a special relationship to exist under *Restatement (Second)* § 315 and to "impose the corresponding duty, there must be some ability to 'control' the third person's conduct." *Volk*, 187 Wn.2d at 264; *Barlow*, 2 Wn.3d at 593. While a duty arising under *Restatement (Second)* § 319 also turns on control, "the amount of control required to meet § 319 is not necessary to fulfill the § 315 special relationship." *Volk*, 187 Wn.2d at 264.

In comparison, to satisfy the amount of control required by *Restatement (Second)* § 319, our Supreme Court found that state parole officers "take charge" of parolees as follows:

> The State can regulate a parolee's movements within the state, require the parolee to report to a parole officer, impose special conditions such as refraining from using alcohol or undergoing drug rehabilitation or psychiatric treatment, and order the parolee not to possess firearms. The parole officer is the person through whom the State ensures that the parolee obeys the terms of his or her parole. Additionally, parole officers are, or should be, aware of their parolees' criminal histories, and monitor, or should monitor, their parolees' progress during parole. Because of these factors, we hold that parole officers have "taken charge" of the parolees they

supervise for purposes of *Restatement (Second)* § 319. When a parolee is likely to cause bodily harm to others if not controlled, the parole officer is under a duty to exercise reasonable care to control the parolee and to prevent him or her from doing such harm.

*Taggart v. State*, 118 Wn.2d 195, 220, 822 P.2d 243 (1992). The court then held that "a parole officer takes charge of the parolees he or she supervises despite the lack of a custodial or continuous relationship." *Id.* at 223.

In *Volk*, however, our Supreme Court concluded that "the actions available to mental health professionals, even in the outpatient setting, weigh in favor of imposing a duty" under *Restatement (Second)* § 315. 187 Wn.2d at 264-66. In providing an example of a mental health professional's ability to control their patient, the court noted:

> As one court reasoned, steps in the outpatient setting can include closer monitoring of compliance with medications and of the patient's mental state, strong family involvement, and informing the patient that he faces involuntary hospitalization unless he remains compliant.

*Id.* at 265 n.12 (citing *Ests. of Morgan v. Fairfield Fam. Counseling Ctr.*, 77 Ohio St. 3d 284, 300, 673 N.E.2d 1311 (1997)).

Here, the evidence shows that WSU had the ability to regulate Gamma Chi's conduct to prevent injury from hazing. Similar to the example highlighted in *Volk*, WSU's relationship with Gamma Chi enabled it to closely monitor Gamma Chi's compliance with the RA and UAH. WSU could reach out and involve Gamma Chi's alumni, BOT members, and ATO National representatives to address issues of concern like hazing or the risks associated with the live-out house. WSU was also able to warn Gamma Chi that it faced sanctions for

violating the RA and UAH.[55]  Specifically, under the RA, WSU could regulate Gamma Chi's conduct by written warnings, reprimands, educational programming, restitution for property damage, monetary fines, probation, suspension, temporary organizational suspension, withdrawal of recognition, or withdrawal of first-year housing privileges.

And, similar to the parole officers at issue in *Taggart*, under the RA, WSU could regulate Gamma Chi's university recognition, require Gamma Chi to meet regularly with the CFSL, instruct Gamma Chi to maintain monthly communication with the CFSL, mandate that Gamma Chi provide WSU with administrative information or attend trainings, and impose on Gamma Chi other special conditions required to maintain recognition.  WSU was the entity solely responsible for ensuring that Gamma Chi complied with the terms of the RA and UAH.  Indeed, after Sam's death, WSU exercised the ultimate control over Gamma Chi and withdrew its recognition of the chapter as a student organization.  In doing so, WSU exercised control over Gamma Chi to prevent the fraternity from harming future WSU students.

Still, WSU contends that it was powerless to control Gamma Chi's conduct at a private residence located off campus.  In like manner, our Supreme Court concluded that WSU "simply ha[d] no authority to dictate the actions of students away from campus." *Barlow*, 2 Wn.2d at 594.  But unlike in *Barlow*, in which the issue was WSU's authority over an individual student perpetrator, the evidence

---

[55] We note that WSU's authority to discipline Gamma Chi arises from its contractual agreements set forth in the RA and UAH, not from its duty under RCW 28B.10.902(3).

on this record supports the determination that WSU had the authority and obligation to exert control over fraternities off campus.

In terms of investigating alleged violations of the RA or UAH, *WSU understood its jurisdiction covered both on-campus and off-campus activity*. Indeed, the fraternities must agree to surrender such authority to WSU as a condition to house first-year students. And the record shows WSU exercised its jurisdiction off campus. During litigation, one WSU representative testified:

> [W]e would get reports of incidents that occurred at live-outs [and] respond . . . [j]ust like we would [to] any off-campus behavior. . . . [W]e would . . . determine whether or not there were students or student organizations that were responsible for violating the WACs and then impose educational sanctions as appropriate.

Another WSU representative said, "My office can respond to reported violations that occur off campus if they create safety concerns . . . or if they impacted the reputation of the university negatively." Their testimony also clarified that most CCS investigations concern "behavior that occurs at private residences, off campus or in close proximity to the campus." And another witness conceded that events at live-outs fall within the CFSL's "sphere of concern."

Based on the evidence before us, we conclude that WSU had sufficient ability to control its recognized fraternity Gamma Chi to give rise to a duty under *Restatement (Second)* § 315(a).

Accordingly, we hold that WSU and Gamma Chi formed a special relationship through their contractual agreements that satisfies the requirements of *Restatement (Second)* § 315(a). "When a special relationship exists under § 315, the party owing a duty must use reasonable care to protect the victim from

the tortious acts of third parties." *H.B.H. v. State*, 192 Wn.2d 154, 169, 429 P.3d 484 (2018) (citing RESTATEMENT (SECOND) OF TORTS § 314A cmt. e (AM. LAW INST. 1965)). So, WSU had a duty to use reasonable care to control Gamma Chi and to protect foreseeable victims from the harm caused by hazing.

We reverse the trial court's order granting summary judgment for WSU and remand to the trial court for further proceedings.

c. Affirmative Acts

Finally, the Estate asserts that WSU's actions in promoting fraternities exposed Sam to a foreseeable and high risk of hazing. It argues that those affirmative acts support an exception from the general rule that WSU had no duty to protect Same from acts of third parties. We disagree.

In some cases, as the Estate alleges here, "[a]n act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal." RESTATEMENT (SECOND) OF TORTS § 302B (AM. LAW INST. 1965). Comment e to *Restatement (Second)* § 302B further provides that a defendant owes a duty of care "where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable [person] would take into account."

The Estate relies on *Washburn* and *Parrilla v. King County*, 138 Wn. App. 427, 157 P.3d 879 (2007), to support the proposition that WSU owed Sam a *Restatement (Second)* § 302B duty. Both cases are distinguishable.

As discussed above, *Washburn* recognized two duties. First, the city had a statutory duty under former RCW 10.14.010 to serve an antiharassment order. 178 Wn.2d at 752, 755-56. Second, the city had a common law duty under *Restatement (Second)* § 302B "to act reasonably in doing so." *Id.* at 752, 759-60.

As to the second duty, our Supreme Court held that "under the facts of this case, [the police officer], as part of his duty to act reasonably, owed [the victim] a duty to guard against the criminal conduct of [the perpetrator]." *Washburn*, 178 Wn.2d at 759. The court noted that the police officer served an antiharassment order on the perpetrator at the victim's residence *with the knowledge that the perpetrator would react violently to receiving the order*. *Id.* Consequently, the court said the officer "created a situation that left [the victim] alone with [the perpetrator] as [he] realized, or was about to realize, that [the victim] had ended their relationship." *Id.* at 760. It clarified that essentially, the officer "had created a new and very real risk to [the victim's] safety based on [the perpetrator's] likely violent response to the antiharassment order and his access to [the victim]." *Id.*

In *Parrilla*, we determined that a bus driver's affirmative acts created a foreseeable risk of harm to others. 138 Wn. App. at 433. There, a metro bus driver pulled over and ordered the passengers off the bus after a fight broke out. *Id.* at 430. One passenger remained on the bus, acting erratically because he was under the influence of drugs. *Id.* at 431. The driver exited the bus with the engine running, which we considered an affirmative act. *Id.* at 431, 438. The

passenger then took control of the bus and crashed it into several cars and caused several injuries, including the plaintiffs'. *Id.* at 431.

We concluded that "the driver's affirmative act exposed" other motorists "to a recognizable high degree of risk of harm from [the passenger's] criminal conduct, which a reasonable person would have taken into account." *Parrilla*, 138 Wn. App. at 440. "[T]he bus driver was fully aware that [the passenger] was acting in a highly volatile manner" and "had displayed a tendency toward criminal conduct by refusing the driver's requests that he leave the bus and by hitting the windows of the bus with his fists." *Id.* "The risk of harm arising from the criminal operation of [the bus] was recognizably high," as the passenger stole the bus "mere moments after it was left unattended, not a remote future time by an unknown individual." *Id.* We held that the county "owed a duty of care" to the injured motorists. *Id.* at 440-41.

Both *Washburn* and *Parrilla* identified specific incidents in which the defendant's affirmative acts (1) immediately created a new, highly recognizable risk of harm and (2) resulted in dire consequences within minutes or several hours later, giving rise to an exception from the general rule that a party has no duty to protect others from acts of third parties. Unlike the situation in those cases, WSU's acts of promoting fraternity participation did not instantly create a new, recognizable risk of harm. Promoting fraternities is not equivalent to leaving a victim alone with a known violent perpetrator after serving him with an antiharassment order. Nor is it akin to leaving a mentally compromised individual alone on a bus with the engine running. Sam arrived on campus in the fall of

47

2019 but his death did not occur until November. The effect of WSU's promotions of fraternities and any impact of those promotions on Sam was not immediate.

Nor did WSU recruit students or direct students to join specific fraternities. It did not take any actions that increased the risk of Gamma Chi hazing Sam on the night of November 11, 2019. The Estate fails to point to any evidence showing that WSU promoted Gamma Chi's Big-Little event or its acts of hazing. Nor is there any evidence to show that WSU's promotion of fraternities generally resulted in an increased risk of danger to Sam through Gamma Chi's conduct specifically. Sam's tragic death is unlike the incidents in *Washburn* and *Parrilla*, which involved specific, not general, events.

The Estate fails to show that a genuine issue of material facts exists that WSU owed Sam a *Restatement (Second)* § 302B duty here.[56] Dismissal of this claim on summary judgment was proper.

In sum, while WSU did not have a statutory duty or any remaining common law duties to protect Sam, it does have a duty arising from its special relationship with its recognized fraternities. So, WSU had a duty to use reasonable care to control Gamma Chi and protect Sam from the foreseeable harms of hazing and alcohol misuse. We reverse the summary judgment order

---

[56] The Estate also suggests that WSU's *failure* to take additional steps to combat hazing establishes a duty under *Restatement (Second)* § 302B. But this does not amount to an affirmative act (misfeasance); rather, it is an act of omission (nonfeasance), and "omission is insufficient to impose a duty under § 302B." *Robb v. City of Seattle*, 176 Wn.2d 427, 439, 295 P.3d 212 (2013).

and remand the case to the trial court for further proceedings consistent with this opinion.

Brennan, J

WE CONCUR:

Chung, J.

Smith, C.J.